UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

MAO XIONG and FRAYDA BURTON,
guardian ad litem for MARILYN          NO. CIV. 08-345 WBS JFM
L. XIONG and ARIEL N. XIONG,

        Plaintiffs,                     <u>MEMORANDUM AND ORDER RE:</u>
                                       <u>MOTION FOR SUMMARY JUDGMENT</u>

    v.

THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY,

        Defendant.
_____/

----oo0oo----

      Plaintiffs Mao Xiong and Frayda Burden, guardian ad litem for Marilyn L. Xiong and Ariel N. Xiong, brought this action in state court against defendant Lincoln National Life Insurance Company ("Lincoln National") alleging breach of contract and breach of the implied covenant of good faith and fair dealing. Having removed the case to federal court, defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

I.   <u>Factual and Procedural Background</u>

      On October 22, 2005, Mitchell Marriot placed a

1

telephone call to Thao Xiong. (Marriot Decl. ¶ 1.) Marriot was employed by Select Quote, a brokerage company selling term life insurance, and Xiong had recently submitted an inquiry to Select Quote through its website. (Id. Ex. A ("Xiong Interview") 1:3-22.) Select Quote was a licensed agent of defendant Lincoln National, and Marriot operated pursuant to that license. (Id. ¶ 2.)[1]

Xiong told Marriot that he and his wife had recently divorced and that he sought life insurance for himself and his mother. (See Xiong Interview 1:18-2:6.) As the conversation progressed, Marriot discovered that Xiong had a life insurance policy with New York Life Insurance Company in the amount of $800,000 ("New York Policy") that Lincoln National could replace at a lower premium. (Marriot Decl. ¶ 3.) Xiong's estranged wife was the beneficiary of the New York Policy. (Compl. ¶ 6.)

Marriot began an application for Xiong on his computer terminal during their conversation. (See, e.g., Asplund Dep.

---

[1]     Defendant objects to the portion of Mitchell Marriot's declaration that describes Select Quote as a "licensed agent of Lincoln National Insurance Company" because "it is a legal conclusion" and "is not based on personal knowledge and lacks foundation." (Def.'s Evid. Obj. (Docket No. 24) at 21.) In context, the court does not view the term "licensed agent" as a legal conclusion that establishes the trappings of an agency relationship; rather, the court recognizes that the term is used to describe the business function of Marriot's employer, Select Quote. This characterization is corroborated by deposition testimony by defendant's Manager of Life Claims and an underwriting manager. (See Bozarth Decl. Ex. B ("Tart Dep.") 24:16-17; id. Ex. C ("Asplund Dep.") 23:11-15.) Furthermore, as a Select Quote employee charged with selling term life insurance policies, Marriot had sufficient personal knowledge as to which companies' policies Select Quote was authorized to sell. Accordingly, defendant's objection is overruled.

2

23:11-23; Marriot Decl. ¶¶ 1-5; Xiong Interview.)[2]  After

inputting information into the application, Marriot told Xiong

that he would relay the application to Lincoln National; a

representative from Lincoln National would call the following

week to complete the process, and Xiong would then receive a

printout of his application in the mail.  (<u>See</u> Xiong Interview

20:10-17.)  After completing a "mini physical," Xiong's next step

would be to "finish the application and sign it and date it and

give it to the nurse when the nurse comes by."  (<u>Id.</u> at 20:10-

21.)

      Xiong signed and dated his application on November 15,

2005.  (Answer Ex. A ("Application") pt. 1 at 4.)  Section 6 of

the application contained a table titled "Total Insurance

Currently In-Force on Proposed Insured" with four columns labeled

"Name of Company," "Amount," "Year of Issue," and "If Business

Insurance, state so below."  (<u>Id.</u> pt. 1 at 2.)  Underneath these

labels, the first row of the table had the following pre-printed

entries: "New York Life Insurance Company," "800,000," "2005,"

and "No," respectively.  (<u>Id.</u>)  Subsection 6(c) then inquired,

"Will the policy applied for replace or change any existing life

insurance or annuity?"  (<u>Id.</u>)  Next to that question, a box

labeled "YES" contained a checkmark.  (<u>See</u> <u>id.</u>)  The application

      [2]    Defendant objects to the consideration of Asplund's
deposition testimony on the ground that plaintiffs "have not
included the reporter's certification that the transcript is a
true record of the testimony of the deponent."  (Def.'s Evid.
Obj. (Docket No. 24) at 3-4.)  However, the complete deposition
lodged with the court pursuant to Local Rule 5-133(j) is
certified; accordingly, defendant's objection is overruled.  <u>See,
e.g.</u>, <u>Bell v. Mejia</u>, No. 06-886, 2008 WL 2917599, at *2 n.1 (E.D.
Cal. July 25, 2008).

also provided:

> Only an officer of the Lincoln National . . . may: make or alter any contract; or agree not to enforce any of the rights of the Lincoln National. **No agent, broker, or medical examiner is authorized to: accept risks; pass on insurability; make or alter contracts; or waive any of the other rights or requirements of the Lincoln National.** Notice to or knowledge imputed to any agent or medical examiner will not be notice of or knowledge to the Lincoln National unless it is set out in writing in this application.

> I have read the statements and answers in this application. To the best of my knowledge and belief, they are true, complete, and correctly stated. They will be the basis for any policy issued based on this application.

(Id. pt. 1 at 4.)

In early January 2006, a document titled "Personal History Interview Form" was generated by Lincoln National containing information about Xiong similar to that found in his application. (See Asplund Decl. Ex. B ("Interview Form").) It appears that this information was obtained in a telephone interview conducted by one "C. Alba" similar to the one conducted by Marriot in October 2005. (See id. at 291; Asplund Decl. ¶ 6.) In response to the question, "Do you have any existing life insurance policies or annuity contracts?," a radio button labeled "Yes" is selected followed by the typed entry "NY LIFE $800,000 TERM." (Interview Form at 291.) The next question asks, "Are you considering discontinuing making premium payments, surrendering, forfeiting, assigning to the insurer or otherwise terminating your existing policy or contract? (if yes, name of company(ies) and when)." (Id.) A radio button labeled "Yes" is selected, followed by the typed entry "NY LIFE--UPON ISSUE." (Id.)

4

On January 20, 2006, defendant approved Xiong's term life insurance policy in the amount of $800,000, which was effective as of December 15, 2005. (Tart Decl. ¶ 3.) The beneficiaries of the policy were Xiong's daughters, Marilyn and Ariel Xiong, and his mother, Mao Xiong. (Application pt. 1 at 2.)

At the time Xiong signed the insurance application, he was in the midst of a divorce proceeding with his estranged wife and subject to a Standard Family Law Restraining Order ("Restraining Order"), which precluded him from cancelling existing insurance policies. (Bozarth Decl. Ex. G ("Cianchetta Decl.") ¶¶ 3-5; Nelson Decl. Ex. E ("Pls.' Resp. Req. Admis.") No. 22.)[3] Xiong's attorney in the divorce proceeding recalls that, in October or November 2005,[4] Xiong asked him about

---

[3] Defendant objects to the consideration of Cianchetta's declaration on the ground that it is irrelevant. (See Def.'s Evid. Obj. (Docket No. 24) at 11.) The court finds that Cianchetta's declaration provides helpful background information regarding Xiong's application for life insurance and the circumstances surrounding his death. See Fed. R. Evid. 401 advisory committee notes ("Evidence which is essentially background in nature . . . is universally offered and admitted as an aid to understanding."). Accordingly, defendant's objection is overruled.

[4] Cianchetta's declaration states that Xiong asked him about insurance "in October or November 200**6**" and that Xiong's estranged wife signed the MSA on "January 3, 200**5**." (Cianchetta Decl. ¶¶ 5-6 (emphasis added).) From the context of the declaration, however, the court infers that these dates should read "October or November 200**5**" and "January 3, 200**6**," respectively. Xiong died before "October or November 2006," and January 3, 2005, would be over ten months prior to finalizing the terms of the MSA. (See id. ¶¶ 4, 8.)

"canceling or purchasing insurance." (Cianchetta Decl. ¶ 5.)[5]
That attorney remembers "telling him that he could buy new
insurance, but could not cancel any existing insurance until the
Judgment was signed by the Court." (Id.)

The Marital Settlement Agreement ("MSA") between Xiong
and his estranged wife was completed on November 15, 2005. (Id.
¶ 4.) Xiong's estranged wife did not sign the agreement until
January 3, 2006, and Xiong's attorney then submitted the MSA to
the family court the following day. (Id. ¶ 5.) Because Xiong's
attorney "failed to make a notation regarding health insurance
for the children on the final Judgment," however, the family
court rejected the final judgment on Xiong's dissolution of
marriage in early April 2006. (Id. ¶ 7.) Xiong's attorney
remedied the deficiency, and final judgment was entered on April
18, 2006. (Id.) That day, Xiong requested a copy of the
judgment before driving to Lompoc, California, to prepare for his
wedding to a new wife, which was scheduled for April 22, 2006.
(Id. ¶ 8.)[6]

---

[5] Defendant objects to this portion of Cianchetta's
declaration on the ground that it is "hearsay not within an
exception" and "vague and ambiguous." (See Def.'s Evid. Obj.
(Docket No. 24) at 13-14.) Cianchetta's statement that Xiong
asked him about "canceling or purchasing insurance" simply
describes something that Xiong did; it does not offer an out of
court statement for the truth of its contents. See Fed. R. Evid.
801(c). The statement is also not so "vague and ambiguous" as to
warrant exclusion under Federal Rule of Evidence 403.
Accordingly, defendant's objection is overruled.

[6] Defendant objects to this portion of Cianchetta's
declaration on the ground that it is "hearsay not within an
exception." (See Def.'s Evid. Obj. (Docket No. 24) at 15-16.)
Cianchetta's statement that Xiong requested a copy of the
judgment simply describes something that Xiong did; it does not
offer an out of court statement for the truth of its contents.

On April 21, 2006, Xiong died of a ruptured aortic aneurism while setting up for his wedding. (Id.; Opp'n Ex. 4; Bozarth Decl. Ex. K.) Xiong's brother, Tia Xiong, contacted defendant in May 2006 to make a claim on behalf of Mao Xiong. (Tart Decl. ¶ 5.) Xiong's attorney from the divorce proceeding also submitted a claim for insurance on behalf of Mao Xiong in June 2006. (Cianchetta Decl. ¶ 9.)

After receiving these claims, defendant commenced a contestability investigation because Xiong had died within two years of the issuance of his policy. (Asplund Decl. ¶ 8.) As a result of this investigation, defendant discovered that at the time of Xiong's death, he had not cancelled the New York Policy. (Id. ¶ 10; Pls.' Resp. Req. Admis. No. 17.) Defendant also discovered that at the time Xiong submitted his application, he had a life insurance policy with Primerica Insurance Company in the amount of $517,500. (Asplund Decl. ¶ 10; Pls.' Resp. Req. Admis. No. 13.)

In a letter dated February 27, 2007, defendant responded to Tia Xiong's claim and presented the findings of the contestability investigation. (Opp'n Ex. 5.) The letter conveyed defendant's conclusion that the policy "was issued in reliance on material misrepresentations and should be rescinded." (Id. at 2.) The February 27, 2007 letter included a check for "all premiums paid of $439.35 plus interest of $15.19." (Id.) Defendant later learned that Xiong also had life insurance policies with Midland National Life Insurance Company and Unum

---

See Fed. R. Evid. 801(c). Accordingly, defendant's objection is overruled.

7

Provident Group in the amounts of $150,000 and $110,000, respectively, at the time he submitted his application. (Asplund Decl. ¶ 13; Pls.' Resp. Req. Admis. Nos. 18, 24.)

Plaintiffs Mao Xiong and Frayda Burden, guardian ad litem for Marilyn L. Xiong and Ariel N. Xiong, filed a Complaint against defendant Lincoln National in state court alleging breach of contract and breach of the implied covenant of good faith and fair dealing. (Docket No. 2 Ex. A.) Defendant then removed the action to this court on February 14, 2008, asserting diversity jurisdiction, 28 U.S.C. § 1332. (Docket No. 2 at 1-3.) Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.

II. <u>Discussion</u>

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the nonmoving party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. <u>Id.</u> at 256. On issues for which the ultimate burden of persuasion at trial lies with the nonmoving party, the moving party bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the nonmoving party's case or by

8

demonstrating that the nonmoving party cannot produce evidence to support an essential element of its claim or defense.  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party carries its initial burden, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but must go beyond the pleadings and, "by affidavits or as otherwise provided in [Rule 56,] set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Valandingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989).  On those issues for which it will bear the ultimate burden of persuasion at trial, the nonmoving party "must produce evidence to support its claim or defense."  Nissan Fire, 210 F.3d at 1103.

In its inquiry, the court must view any inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The court also may not engage in credibility determinations or weigh the evidence, for these are jury functions.  Anderson, 477 U.S. at 255.

A.   Breach of Contract

California Insurance Code section 331 provides that "[c]oncealment, whether intentional or unintentional, entitles the injured party to rescind insurance."  Similarly, California Insurance Code section 359 instructs, "If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time

9

the representation becomes false." California courts "have
applied Insurance Code sections 331 and 359 to permit rescission
of an insurance policy based on an insured's negligent or
inadvertent failure to disclose a material fact in the
application for insurance." <u>Mitchell v. United Nat'l Ins. Co.</u>,
127 Cal. App. 4th 457, 469 (2005) (collecting cases). "The
burden is on the insurer to prove that the applicant breached the
duty to disclose material facts." <u>Miller v. Republic Nat'l Life
Ins. Co.</u>, 789 F.2d 1336, 1340 (9th Cir. 1986) (citing <u>Olson v.
Standard Marine Ins. Co.</u>, 109 Cal. App. 2d 130, 137 (1952));
<u>accord</u> <u>Thompson v. Occidental Life Ins.</u>, 9 Cal. 3d 904, 919
(1973).

     Defendant argues that two material misrepresentations
support its affirmative defense of rescission on plaintiffs claim
for breach of contract: (1) Xiong's failure to disclose a
restraining order preventing him from immediately terminating his
New York Life policy and (2) Xiong's failure to disclose life
insurance policies he held with Primerica, Midland, and Unum
Provident Group.

     As to the first purported material misrepresentation,
defendant asserts that "Mr. Xiong clearly indicated in his
application with Lincoln that he would replace his New York Life
policy." (Def.'s Mem. Supp. Summ. J. 5:3-4.) Because Xiong was
subject to the Restraining Order at the time of his application,
defendant concludes that "Mr. Xiong was attempting to defraud
Lincoln into issuing a policy that it would not have issued if
Mr. Xiong had been truthful." (<u>Id.</u> at 5:10-12.) The evidence
currently before the court, however, presents genuine issues of

10

material fact as to whether Xiong made any misrepresentation to defendant regarding the replacement of the New York Policy, let alone a misrepresentation that was sufficiently material to justify rescission.

First, ample evidence suggests that Xiong intended to replace his New York Policy. It is undisputed that Xiong's estranged wife was the beneficiary of his New York Policy, and he specifically told Mitchell Marriot of Select Quote that he wanted to replace it with a new life insurance policy from Lincoln National. (Marriot Decl. ¶ 3.) Subsection 6(c) of Xiong's application inquired, "Will the policy applied for replace or change any existing life insurance or annuity?," and a box next to that question labeled "YES" contained a checkmark. (Application pt. 1 at 2.) Although Xiong could not immediately replace his New York Policy due to the Restraining Order, entry of final judgment on his divorce was rapidly approaching at the time Xiong signed his application. (See Cianchetta Decl. ¶¶ 3-5.) The trier of fact could reasonably conclude that Xiong intended to terminate his New York Policy as soon has the Restraining Order was lifted, which is wholly consistent with the entry in Subsection 6(c) of the application.

The application, moreover, did not request a representation that the New York Policy would be replaced immediately or by a specific date. Indeed, statements made by Marriot during the application interview may reasonably suggest that immediate replacement of the New York Policy was not necessary. During that conversation, Xiong asked, "how do I know when, when I apply through Lincoln National, how do I know when

I'm done applying?" (Id. at 17:11-12.) Marriot explained,

"[Y]ou'll get the cont[r]act in the mail and you'll pay the first

bill; that's when you are confident that you can get rid [o]f

your other policy. But even after you pay the bill, you should

wait maybe one week or two weeks until I call you and say they

have your check, everything is good now." (Id. at 17:17-21.)

Whether or not Marriot appropriately advised Xiong, the

trier of fact could reasonably find that Xiong relied on

Marriot's statements regarding the flexibility in cancelling the

New York Policy.[7]  Consequently, the trier of fact could

---

[7]  Defendant objects to the consideration of Marriot's
conversation with Xiong on the ground that it is irrelevant.
Because the application stated that "No agent . . . is authorized
to . . . make or alter contracts" or "waive any of the rights or
requirements of the Lincoln National," defendant contends that
any statements made by Marriot do not affect defendant's right to
rescind Xiong's policy. (See Def.'s Evid. Obj. (Docket No. 24)
at 2.)  Although Marriot's statements may be irrelevant with
respect to determining the terms of the policy, they are
probative of whether Xiong's purported omissions were supported
by "plausible explanations." Thompson, 9 Cal. 3d at 919.  For
example, California caselaw clearly instructs that an insured has
no duty to disclose a medical condition about which he or she was
misinformed by his or her physician. See id. at 917 (excusing an
insured from reporting that she had arteriosclerosis where her
physicians never informed her of the seriousness of her varicose
veins and poor circulation).  Similarly, an insurer cannot
rescind a contract where an agent has incorrectly advised the
insured as to the meaning of ambiguous questions on the
application. See MacDonald v. Zurich Life Ins. Co. of Am., No.
03-3538, 2004 WL 2326371, at *3-4 (N.D. Cal. Oct. 14, 2004)
(finding a genuine issue of material fact as to plaintiff's
"plausible explanation" for omitting his medical history in his
insurance application where he alleged that "the agent told him
that he did not have to include it").  Here, the application did
not inquire as to when Xiong would terminate his New York Policy,
and the application language cited by defendant does not limit
Marriot's ostensible authority to explain the application
process.
     Defendant also objects to this evidence on the ground
that it lacks foundation, is not based on personal knowledge, and
is not properly authenticated. (See Def.'s Evid. Obj. (Docket
No. 24) at 2.)  The transcribed conversation of Xiong and Marriot
is authenticated by Marriot's declaration and the declaration of

12

reasonably conclude that Xiong's failure to disclose the
Restraining Order would not constitute a misrepresentation.  <u>See</u>
<u>Wilson v. W. Nat'l Life Ins. Co.</u>, 235 Cal. App. 3d 981, 994
(1991) ("[T]he burden was on [the insurer] to negate to the
satisfaction of the trier of fact the various plausible
explanations for the incomplete answers on [the] application."
(quoting <u>Thompson</u>, 9 Cal. 3d at 919)); <u>see also</u> <u>MacDonald v.</u>
<u>Zurich Life Ins. Co. of Am.</u>, No. 03-3538, 2004 WL 2326371, at *3-
4 (N.D. Cal. Oct. 14, 2004) (finding a genuine issue of material
fact as to plaintiff's "plausible explanation" for omitting his
medical history in his insurance application where he alleged
that "the agent told him that he did not have to include it").

        The document titled "Personal History Interview Form"
indicates that Xiong was "considering" terminating his New York
Policy "upon issue" of his new policy with Lincoln National.
(<u>See</u> Interview Form at 291.)  The precise nature of this document
and how it was generated remains unclear; nonetheless, even if
Xiong personally completed it or provided answers over the
telephone, the statements attributed to him are far from resolute
representations regarding if and when he would terminate the New
York Policy.  Indeed, the rather imprecise phrasing of this
question--asking whether the insured was "considering"
terminating an existing contract--may also reasonably suggest to
the trier of fact that the insured's response was immaterial to

---

Terri L. Harper, a certified transcriptionist who transcribed the
audio recording of the conversation maintained by Select Quote.
(<u>See</u> Marriot Decl. ¶¶ 2-4; <u>id.</u> Ex. B at 26; <u>id.</u> Ex. A.)
        Accordingly, for the foregoing reasons, defendant's
objection is overruled.

13

the insurer's risk assessment. This inference is supported by other documents produced during discovery as well as information developed at oral argument suggesting that these interview questions may have been intended to fulfill Lincoln National's obligation to notify Xiong's previous insurer of the proposed replacement rather than assist Lincoln National in assessing its own risk.

As to Xiong's failure to disclose life insurance policies he held with Primerica, Midland, and Unum Provident Group, defendant has not shown that this failure amounted to a material misrepresentation as a matter of law. Xiong's apparent duty to disclose these policies stemmed from the title of Section 6 of the application, which stated, "<u>Total</u> Insurance Currently In-Force on Proposed Insured." (Application pt. 1 at 2 (emphasis added).)[8] During the application interview, however, Marriot did not ask Xiong to provide all of his "currently in-force" life insurance policies; indeed, aside from Xiong's application, the only evidence that this information was "material" to defendant's decision to extend coverage is the declaration of one of defendant's underwriters, Frank Asplund. (<u>See</u> Asplund Decl. ¶ 10 ("Even if Mr. Xiong had replaced the New York Life policy, Lincoln would not have issued the policy as applied for, because the total amount of insurance that Mr. Xiong would have in force

---

[8]    The Personal History Interview Form asks, "Do you have any existing life insurance policies or annuity contracts?" (Interview Form at 291.)  It does not ask the insured to list any of the specific policies unless he or she is "considering" terminating them.  (<u>See</u> <u>id.</u>)

14

. . . would exceed Lincoln's underwriting guidelines.").)[9]

In general, "[t]he fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law." Imperial Cas. & Indem. Co. v. Sogomonian, 198 Cal. App. 3d 169, 179 (1988) (quoting Thompson, 9 Cal. 3d at 916). Nonetheless, "a simple incorrect answer on an insurance application will not give rise to a defense of fraud, where the true facts, if known, would not have made the contract less desirable to the insurer." Merced County Mut. Fire Ins. Co. v. State, 233 Cal. App. 3d 765, 773 (1991) (citing Thompson, 9 Cal. 3d at 916; Ransom v. Penn Mut. Life Ins. Co., 43 Cal. 2d 420, 427 (1954)); accord Imperial, 198 Cal. App. 3d at 181. The trier of fact, moreover, "is not required to believe the 'post mortem' testimony of an insurer's agents that insurance would have been refused had the true facts been disclosed." Imperial, 198 Cal. App. 3d at 181 (quoting Thompson, 9 Cal. 3d at 916); see Atmel Corp. v. St. Paul Fire & Marine Ins. Co., 416 F. Supp. 2d 802, 811 (N.D. Cal. 2006) (providing that testimony by an underwriter that "he would not have insured [plaintiff] had he known" certain

[9]     Plaintiffs object to the consideration of any evidence regarding the materiality of Xiong's purported omissions because defendant has not produced its underwriting manual. (See Pls.' Evid. Obj. & Req. Sanctions (Docket No. 21) at 1-7.)  Plaintiffs also object to the consideration of any evidence that Xiong's application was "incorrect, false, or fraudulent" because defendant did not produce evidence in its control pertaining to Marriot's telephone interview with Xiong.  (Id. at 7-11.) Because the court concludes that the aforementioned evidence is insufficient to grant defendant's motion for summary judgment, the court need not address plaintiffs' objections.  As to whether defendant's purported discovery violations will result in sanctions pursuant to Federal Rule of Civil Procedure 37, the court will address this issue at a later date.

undisclosed information, while "probative of materiality," could not support summary judgment for the defendant insurer); <u>see also</u> 6 Lee R. Russ & Thomas F. Segalla, <u>Couch on Insurance</u> § 82.15 (3d ed. 2008) ("[T]he testimony of officers or underwriters of an insurer that they would not have accepted a risk if they had known of certain conditions which a true statement by the insured in his or her application would have revealed, is not, of course, conclusive as to the materiality of the misrepresentation in the application.").

       In response to plaintiffs' opposition, defendant has submitted a "Supplemental Declaration of Frank Asplund" in which Asplund asserts, "I relied upon Lincoln's underwriting guidelines in determining the maximum amount of insurance Mr. Xiong would have qualified for. These guidelines are contained in a booklet entitled 'Lincoln GTO.' A true and correct copy of this booklet is attached to this declaration as Exhibit A." (Asplund Suppl. Decl. ¶ 5.) The Lincoln GTO booklet, however, appears to be an abbreviated summary of the underwriting guidelines that is intended for "agent or broker use only." (Asplund Suppl. Decl. Ex. A ("Lincoln GTO") 50.) Although the booklet provides the "parameters used in determining the maximum amount of insurance that can be in force on an individual," it also instructs that these parameters may be "exceeded" in certain circumstances and that, in such cases, "a detailed explanation should be provided to help the underwriter evaluate the risk." (<u>Id.</u> at 51.) Consequently, there remains a genuine issue of material fact as to whether, according to Lincoln National's past underwriting

practices or its underwriting manual,[10] it would have permitted
Xiong to exceed the parameters provided in the Lincoln GTO
booklet.

Furthermore, plaintiffs have adduced evidence tending
to show that defendant knew or should have known of Xiong's other
life insurance policies when he applied; if believed by the trier
of fact, these facts may constitute a waiver of defendant's
purported right to rescission. See Cal. Ins. Code. 336 ("The
right to information of material facts may be waived . . . by
neglect to make inquiries as to such facts, where they are
distinctly implied in other facts of which information is
communicated."); Unionamerica Ins. Co., Ltd. v. Fort Miller
Group, Inc., 590 F. Supp. 2d 1254, 1260-61 (N.D. Cal. 2008)
(noting that California Insurance Code section 336 imposes a duty
upon insurers "to investigate the accuracy of the information
provided by the insured, if it knows or should know the
information is untrue" (citing State Farm Mut. Auto. Ins. Co. v.

---

[10]    According to Asplund's deposition, there appears to be
an "underwriting manual" that may contain a more detailed
explanation regarding the parameters provided in the Lincoln GTO
booklet:

**Q:**    What is that booklet?

**A:**    It's a sales brochure.  Also a rate book.

**Q:**    Is that the underwriting manual?

**A:**    No.

**Q:**    Is that booklet given to the insured or is it just
         sent to agents and brokers?

**A:**    It's for the agents and brokers.

(Asplund Dep. 23:4-10.)

1  <u>Partridge</u>, 10 Cal. 3d 94, 102 (1973); <u>Ransom</u>, 43 Cal. 2d at 424
2  (1954)).

3         During discovery, defendant produced a "requirements
4  document" associated with Xiong's Lincoln National policy, which
5  included information supplied by the Medical Index Bureau
6  ("MIB"). (<u>See</u> Opp'n Exs. 1, 6 ("Requirements Document"); Asplund
7  Dep. 12:14-20.) As Asplund explained, the MIB is a
8  "clearinghouse used by life insurance companies" to "prevent,
9  deter, and detect fraud by alerting the underwriter to possible
10  significant medical or nonmedical conditions that have been
11  developed by other application within the last seven years. It
12  also serves as an alert for policies that would have been applied
13  for the last two years." (Asplund Dep. 10:2-11.) Information
14  from the MIB automatically "downloads" into the worksheet of the
15  underwriter who underwrites a policy. (<u>Id.</u> at 11:5-10.) A case
16  manager then inputs information from this worksheet into the
17  requirements document. (<u>Id.</u> at 12:20-13:6.)

18         The requirements document for Xiong's Lincoln National
19  policy contained several entries called "hits." (<u>See</u>
20  Requirements Document at 275.) A "hit" indicates that another
21  insurance company has information about a person who "matches the
22  demographics of [the] proposed insured." (Asplund Dep. 14:4-10.)
23  Plaintiffs' counsel questioned Asplund about the hits on Xiong's
24  requirements report as follows:

25     **Q.**  [L]ooking at the four pages that appear to be MIB
            reports, or at least information . . . can you tell
26            how many different sources of information there
            are? In other words, did all this come from one
27            insurance company, two insurance companies, three
            insurance companies, or any number of insurance
28            companies?

**A.** Well, you can see there are numerous hits. You can't tell how many insurance companies are involved. It could all be the same company. Every code could be a different company.

**Q.** But in order to find out you would have to contact MIB, you couldn't tell from these sheets?

**A.** Yeah. And you only contact MIB if you're unable to verify the codes by your own investigation. That's part of the rules of MIB.

**Q.** Well, do you know if there was an attempt to verify this information, either by you or any other person at Lincoln Financial, prior to the policy being issued?

**A.** There was no need.

**Q.** And why was that?

**A.** There was no significant information in the codes that required us to investigate any further.

**Q.** There was no information that you thought increased your risk in other words?

**A.** Correct.

(Asplund Dep. 17:25-18:25.)[11]

In light of this evidence, the trier of fact could reasonably conclude that Xiong's undisclosed policies were either immaterial to defendant's decision to extend coverage or that defendant waived any right to rescind based on this non-disclosure. See generally Unionamerica, 590 F. Supp. 2d at 1261 (noting that, while "the insured has a duty to truthfully and

---

[11]     In response to plaintiffs' opposition, defendant has submitted a "Supplemental Declaration of Frank Asplund" in which Asplund asserts, "When I reviewed the [MIB] report for Mr. Xiong, I determined that the [MIB] report only contained one entry that actually pertained to Mr. Xiong." (Asplund Suppl. Decl. ¶ 4.) Nonetheless, the court finds that the juxtaposition of Asplund's supplemental declaration and his deposition reinforces the existence of a genuine issue of material fact as to whether defendant knew or should have known of Xiong's additional life insurance policies.

19

completely answer the questions on the application," the insurer
has "a duty to ask the applicant to provide further information
if it knows or should know that the application is inaccurate or
incomplete"); <u>Barrera v. State Farm Mut. Auto. Ins. Co.</u>, 71 Cal.
2d 659, 678 (1969) (requiring an insurer to undertake a
reasonable investigation of the insured's insurability within a
reasonable period of time from the acceptance of the application
and the issuance of the policy).

Defendant finally contends that plaintiffs' claim for
breach of contract fails as a matter of law because Xiong
"received more coverage than he was qualified for and therefore
suffered no damages." (Def.'s Mem. Supp. Summ. J. 12:22-24.)
Defendant's argument is without merit; plaintiffs have not
brought a survival action, and thus the issue of Xiong's personal
damages is irrelevant. <u>See, e.g.</u>, <u>Garofalo v. Princess Cruises,
Inc.</u>, 85 Cal. App. 4th 1060, 1072-73 (2000). Furthermore, as the
beneficiaries of Xiong's term life insurance policy in the amount
of $800,000, the rescission of this policy by defendant plainly
damaged them. <u>See, e.g.</u>, <u>St. Paul Fire & Marine Ins. Co. v. Am.
Dynasty Surplus Lines Ins. Co.</u>, 101 Cal. App. 4th 1038, 1061
(2002).

Thus, as detailed above, genuine issues of material
fact remain as to plaintiffs' claim for breach of contract;
accordingly, the court must deny defendant's motion for summary
judgment on this claim.[12]

---

[12] In addition to presenting genuine issues of material
fact, plaintiffs have argued that defendant's practice of denying
coverage due to other existing life insurance policies violates
California Insurance Code section 10110.1(b), which provides that

20

1    B.   <u>Breach of the Implied Covenant of Good Faith and Fair</u>

2         <u>Dealing</u>

3         California law "implies in every contract, including

4    insurance policies, a covenant of good faith and fair dealing."

5    <u>Wilson v. 21st Century Ins. Co.</u>, 42 Cal. 4th 713, 720 (2007).

6    The implied covenant of good faith and fair dealing "requires

7    each contracting party to refrain from doing anything to injure

8    the right of the other to receive the agreement's benefits."  <u>Id.</u>

9    (quoting <u>Frommoethelydo v. Fire Ins. Exch.</u>, 42 Cal. 3d 208, 214

10   (1986)).  Under this implied obligation, an insurer "must give at

11   least as much consideration to the interests of the insured as it

12   gives to its own interests.  When the insurer unreasonably and in

13   bad faith withholds payment of the claim of its insured, it is

14   subject to liability in tort."  <u>Id.</u> (quoting <u>Frommoethelydo</u>, 42

15   Cal. 3d at 214).

16        In support of its motion for summary judgment,

17

18   "[a]n individual has an unlimited insurable interest in his or
19   her own life."  Although the court need not reach this issue to
     resolve the instant motion, one could question why an insurer
20   would effectively limit the total amount of life insurance an
     insured may carry when California law has expressly found that
21   public policy is not served by prescribing a cap on this
     particular form of insurance. <u>Cf., e.g.</u>, <u>Conn. Mut. Life Ins. Co.</u>
22   <u>v. Schaefer</u>, 94 U.S. 457, 461-62 (1876) ("And in cases where the
     insurance is effected merely by way of indemnity, as where a
23   creditor insures the life of his debtor, for the purpose of
     securing his debt, the amount of insurable interest is the amount
24   of the debt."); <u>Brown v. Mass. Cas. Ins. Co.</u>, 1995 WL 470855, at
     *3 (9th Cir. Aug. 8, 1995).
25        Plaintiffs also contend that the limit on life
     insurance coverage effectively imposed by defendant is an
26   unenforceable "by-law" that is not stated in the insurance policy
     itself.  <u>See</u> Cal. Ins. Code § 10113.  Although the parties have
27   provided several copies of Xiong's application for life
     insurance, they have not submitted his life insurance policy for
28   consideration; accordingly, the court is unable to consider this
     argument.

                                    21

defendant contends that plaintiff's claim for breach of the implied covenant of good faith and fair dealing is foreclosed by the "genuine dispute rule."[13]  The genuine dispute rule provides that "an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract."  Id. at 723 (quoting Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co., 90 Cal. App. 4th 335, 347 (2001)).

As the California Supreme Court has explained, the genuine dispute rule does not "alter the standards for deciding and reviewing motions for summary judgment."  Id. at 724.  Rather, a trial court may grant summary judgment in favor of a defendant-insurer based on the genuine dispute rule only where "it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable--for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law."  Id. (quoting Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1161 (9th Cir. 2002)).  However, summary judgment

_____

[13]    Defendant also argues that plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law because their claim for breach of contract cannot withstand summary judgment.  See, e.g., Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 36 (1995) ("Absent that contractual right . . . the implied covenant has nothing upon which to act as a supplement, and 'should not be endowed with an existence independent of its contractual underpinnings.'" (quoting Love v. Fire Ins. Exch., 221 Cal. App. 3d 1136, 1153 (1990))).  Because plaintiffs' breach of contract claim does, in fact, withstand summary judgment, the court rejects this argument.

22

should be denied "where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." Amadeo, 290 F.3d at 1162 (citing Neal v. Farmers Ins. Exch., 21 Cal. 3d 910, 920-21 (1978)).

Here, plaintiffs have adduced sufficient evidence whereby a jury could conclude that not only was defendant incorrect to deny plaintiffs' claim, but also that defendant's basis for doing so was unreasonable. For example, there is a genuine issue of material fact as to whether Xiong's purported omissions were material to defendant's decision to extend coverage; if the trier of fact concludes that these omissions were immaterial to defendant's risk assessment, it could further conclude that the subsequent denial of plaintiffs claim was unreasonable. Cf. Mitchell v. United Nat'l Ins. Co., 127 Cal. App. 4th 457, 475 (2005) ("It seems unreasonable to conclude that an incorrect answer to any question on an insurance application automatically would constitute a material misrepresentation for purposes of rescission." (emphasis added)).

Plaintiffs have also adduced evidence from which the trier of fact may conclude that defendant did not conduct an adequate investigation before denying plaintiffs' claim. See, e.g., Safeco Ins. Co. of Am. v. Parks, 170 Cal. App. 4th 992, 1003 (2009) ("The duty of good faith and fair dealing implied in every insurance contract includes a duty on the part of the insurer to investigate claims submitted by its insured."). Specifically, defendant's Manager of Life Claims, Lydia Tart, testified that the investigation into Xiong's claim relied exclusively upon Xiong's application. (See Tart Dep. 16:3-6, 22-

23

23 ("[W]hen I am reviewing the claim, I am going strictly off of the application.").)[14]  When asked specific questions about her investigation, Tart answered as follows:

> **Q.**  Okay.  Did you know that in the Xiong case there was a recording of the agent's conversation with Mr. Xiong?
>
> **A.**  I did not until I saw this.
>
> **Q.**  Have you--have you listened to the recording?
>
> **A.**  No.
>
> . . .
>
> **Q.**  Do you know what the agent had told Mr. Xiong about when he should replace the New York Life policy?
>
> **A.**  I don't.
>
> . . .
>
> **Q.**  Would that be significant?
>
> . . .
>
> **A.**  I don't know.
>
> . . .
>
> **Q.**  Did you ever hear that there was a stay order preventing him from canceling any life or health insurance . . . ?
>
> . . .
>
> **A.**  I did not.
>
> **Q.**  Would that be a significant thing to know?

---

[14]  Defendant objects to the consideration of Tart's deposition testimony on the ground that plaintiffs "have not included the reporter's certification that the transcript is a true record of the testimony of the deponent."  (Def.'s Evid. Obj. (Docket No. 24) at 3.)  However, the complete deposition lodged with the court pursuant to Local Rule 5-133(j) is certified; accordingly, defendant's objection is overruled.  <u>See, e.g.</u>, <u>Bell v. Mejia</u>, No. 06-886, 2008 WL 2917599, at *2 n.1 (E.D. Cal. July 25, 2008).

**A.** Yes.

**Q.** Did you ever hear that Mr. Xiong died within three days of his divorce becoming final?

**A.** No.

(_Id._ at 16:24-20:10.)

    In her deposition, Tart was also asked about a document titled "Agent's Statement," which she described as a "standard letter that is sent out to the agent on all contestable claims." (_Id._ at 24:16-17.) The form contains a series of questions and handwritten answers and was signed by Mitchell Marriot of Select Quote on November 14, 2006. (Bozarth Decl. Ex. I at 285 ("Agent's Stmt.") at 1-3.)[15] Question 4a asks, "Did you ask the Insured each question as it appeared on the application?"; an "X" appears next to the word "Yes," along with the following qualification: "or very close to it." (_Id._ at 1.) In response to Question 4c, which asks, "Who recorded the proposed Insured's answers on the application?," Marriot wrote "that was completed by a call center." (_Id._) Question 4d then asks, "Did that

----

[15]    Defendant objects to the consideration of the document titled "Agent's Statement" because plaintiffs "have failed to properly authenticate the document." (Def.'s Evid. Obj. (Docket No. 24) at 4.) In general, the evidentiary requirement of authentication is a species of relevance that "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). The document titled "Agent's Statement" was produced by defendant during discovery from Xiong's claim file and was identified as such by defendant's Manager of Life Claims during her deposition. (_See_ Tart Dep. 23:22-24:19); _see also_ Fed. R. Evid. 901(b)(1). The contents of the document, which relay specific details of Xiong's claim file that are corroborated by other evidence, also support the exhibit's authenticity, and the signature on the document is similar to that on Mitchell Marriot's authenticated declaration. _See_ Fed. R. Evid. 901(b)(4). Accordingly, defendant's objection is overruled.

person record each answer?" (<u>Id.</u>) Two "X's" appear next to the words "Yes" and "No"; the "X" next to "Yes" is circled, while the "X" next to "No" is crossed out alongside Marriot's initials and a circled question mark. (<u>Id.</u>) Despite the ambiguities in these responses, Tart did not contact Marriot during her investigation:

**Q.** You didn't contact the agent, did you?

**A.** No sir.

**Q.** Did you know who it was?

**A.** Just from this.

. . .

**Q.** What you're judging is the intent of the insured when you're looking at the application, the intent of the insured when he made out the applications, isn't that true?

**A.** Yes, sir.

**Q.** And you don't think it was important to know what he was told when he was making out the application regarding his intent?

**A.** I rely on the application that's got his signature on it and the agent's signature.

(Tart Dep. 26:16-27:14.) In light of this testimony, a trier of fact could reasonably conclude that defendant breached the implied covenant of good faith and fair dealing by deficiently investigating plaintiffs' claim. <u>See</u> <u>Egan v. Mut. of Omaha Ins. Co.</u>, 24 Cal. 3d 809, 819 (1979) ("[A]n insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial."); <u>see also</u> <u>Jordan v. Allstate Ins. Co.</u>, 148 Cal. App. 4th 1062, 1074 (2007) (providing that an insurer "cannot claim a 'genuine dispute' regarding coverage" because, "by failing to investigate, it has deprived itself of the ability to make a fair evaluation of the

claim" (citing <u>Chateau Chamberay</u>, 90 Cal. App. 4th at 348-49
(2001)).

　　　　Accordingly, because genuine issues of material fact
exist that may support a claim for breach of the implied covenant
of good faith and fair dealing, the court must deny defendant's
motion for summary judgment on this claim.

　　　　C.　<u>Punitive Damages</u>

　　　　"In the insurance policy setting, an insured may
recover damages not otherwise available in a contract action,
such as emotional distress damages resulting from the insurer's
bad faith conduct and punitive damages if there has been
oppression, fraud, or malice by the insurer." <u>Cates Constr.,</u>
<u>Inc. v. Talbot Partners</u>, 21 Cal. 4th 28, 43-44 (1999) (citations
omitted).　Under California Civil Code section 3294, a plaintiff
must prove "oppression, fraud, or malice" by "clear and
convincing evidence."　Cal. Civ. Code § 3294(a).

　　　　"[W]here the plaintiff's ultimate burden of proof will
be by clear and convincing evidence, the higher standard of proof
must be taken into account in ruling on a motion for summary
judgment." <u>Spinks v. Equity Residential Briarwood Apartments</u>,
171 Cal. App. 4th 1004, 1053 (2009) (quoting <u>Am. Airlines, Inc.</u>
<u>v. Sheppard, Mullin, Richter & Hampton</u>, 96 Cal. App. 4th 1017,
1049 (2002)).　Nonetheless, "[w]hile 'the "clear and convincing"
evidentiary standard is a stringent one, it does not impose on a
plaintiff the obligation to "prove" a case for punitive damages
at summary judgment.'" <u>Id.</u> (quoting <u>Am. Airlines</u>, 96 Cal. App.
4th at 1049).　Summary judgment "on the issue of punitive damages
is proper" only "when no reasonable jury could find the

27

plaintiff's evidence to be clear and convincing proof of malice, fraud or oppression." Hoch v. Allied-Signal, Inc., 24 Cal. App. 4th 48, 60-61 (1994). "In the usual case, the question of whether the defendant's conduct will support an award of punitive damages is for the trier of fact, 'since the degree of punishment depends on the peculiar circumstances of each case.'" Spinks, 171 Cal. App. 4th at 1053 (quoting Hannon Eng'g, Inc. v. Reim, 126 Cal. App. 3d 415, 431 (1981)).

Although a breach of the implied covenant of good faith and fair dealing does not automatically give rise to punitive damages, see Silberg v. Cal. Life Ins. Co., 11 Cal. 3d 452, 462-63 (1974), it is difficult to imagine a situation in which evidence could support a finding of bad faith on behalf of an insurance company yet foreclose the possibility of punitive damages, even where the burden at trial will be "clear and convincing" evidence, see, e.g., R & R Sails, Inc. v. Ins. Co. of Pa., --- F. Supp. 2d ----, 2009 WL 862103, at *10 (S.D. Cal. Mar. 30, 2009) ("Given that material issues of fact exist as to whether Defendant acted in bad faith, the Court cannot conclude as a matter of law that Defendant did not act with malice, oppression, or fraud in its handling of Plaintiff's claim." (citing Nasiri v. Allstate Indem. Co., 41 F. App'x 76, 79 (9th Cir. 2002))); Metro. Bus. Mgmt., Inc. v. Allstate Ins. Co., 2009 WL 691192, at *5 (C.D. Cal. Mar. 16, 2009) (same); Back v. Allstate Ins. Co., Inc., No. 04-5, 2005 WL 1683885, at *10 (E.D. Cal. July 13, 2005) ("Because . . . the court cannot resolve the bad faith question, summary judgment as to punitive damages must also be denied.").

Upon careful review of the evidence supporting plaintiff's claim for breach of the implied covenant of good faith and fair dealing, the court cannot conclude that no reasonable jury could find by clear and convincing evidence that defendant acted with oppression, fraud, or malice.  Accordingly, the court must deny defendant's motion for summary judgment as to plaintiff's request for punitive damages.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment be, and the same hereby is, DENIED.

DATED:  May 28, 2009

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE